UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LASHAUN CASEY, | : | CIVIL NO: 1:21-cv-01367 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM OPINION

### I. Introduction.

Plaintiff Lashaun Casey ("Casey") claims that, while incarcerated at United States Penitentiary (USP) Canaan, he suffered from permanent damage to his wrist and hand due to the negligence of medical staff. Accordingly, proceeding pro se, Casey brings claims under the Federal Tort Claims Act (FTCA) against the United States. Currently pending is the United States' motion to dismiss the amended complaint and for summary judgment. For the reasons set forth below, we will grant the motion, and dismiss certain claims for lack of subject matter jurisdiction and we will grant summary judgment on the remaining claims in favor of the United States.

## II.  Background and Procedural History.

### A.  Procedural History.

Casey began this action by filing a complaint on August 5, 2021 (*doc. 1*), which the US Marshals served (*doc. 8*).  Casey filed with his complaint both a motion to proceed *in forma pauperis* (*doc. 2*), which we later granted (*doc. 7*), and a motion for appointed counsel (*doc. 4*), which we later denied (*doc. 11*).  Because Casey failed to file a certificate of merit with the complaint, as required by Pennsylvania Rule of Civil Procedure 1042.3, the United States sent Casey a notice advising him that he had "30 days to file a certificate of merit, or otherwise, the United States [would] file a dispositive motion regarding his failure to file the required certificate." *Doc. 13* at 1–2.  The United States, therefore, filed a motion for an extension of time to respond to the complaint to allow for this time to pass (*id.*), which we granted (*doc. 14*).  This initiated extensive motions practice.[1]  During these proceedings, the parties consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c). *Doc. 31*.

Casey filed a total of four motions for an extension of time to file a certificate of merit (*docs. 16, 19, 24, 30*); we granted three of these motions (*docs.*

---

[1] Casey filed a total of three additional motions for the appointment of counsel (*docs. 15, 21, 42*), all of which we denied (*docs. 18, 23, 48*).  Casey also, at different times during the proceedings, filed a request for production of documents (*doc. 20*) and a motion for the appointment of an expert (*doc. 44*), both of which we denied (*docs. 23, 48*).

2

*18, 23, 25, 32*), and granted the United States extensions of time to respond to the complaint, accordingly (*docs. 22, 29*).  Casey did eventually file a certificate of merit. *Doc. 35*.  The United States, however, filed a motion to strike the certificate of merit (*doc. 38*) and a brief in support thereof (*doc. 39*).  We eventually granted the motion, struck the certificate of merit, and set a new due date for a proper certificate of merit. *Doc. 48*.  Casey also filed an amended complaint (*doc. 46*), after seeking and being granted leave to amend the complaint to correct the name of one of the medical providers involved in his treatment (*docs. 36, 37*).

Though he sought (*doc. 49*), and was granted (*doc. 50*), a stay of the case, Casey failed to file a second certificate of merit before this extended date expired (*see docket generally*).  Accordingly, the United States filed a motion to dismiss and for summary judgment (*doc. 53*), and—after filing a motion to exceed the page limit (*doc. 54*), which we granted—a brief in support of this motion (*doc. 58*) and a statement of facts (*doc. 57*).  After we granted multiple motions for an extension of time to file a brief in opposition (*docs. 67, 70, 74*) and a motion to exceed the word limit (*doc. 75, 79*), Casey filed a brief in opposition to this motion (*doc. 77*) and answer to the statement of facts (*doc. 78*).  The United States then filed a reply brief. *Doc. 80*.  Though Casey sought leave to file a sur-reply, and an extension of time to do so, we denied this request. *Docs. 81, 82*.

### B. Allegations in the Amended Complaint.

Casey relies on a declaration attached to the form complaint which outlines the factual allegations. *Doc. 46-1*. The following facts are taken from this declaration.

On August 3, 2018, Casey had surgery on his left wrist in Wayne Memorial Hospital. *Id.* at 2. The surgeon, Jeffrey Mogerman, M.D. ("Dr. Mogerman"), put Casey in a cast after this surgery, and removed it on August 25, 2018. *Id.* After surgery, a lump began to grow "on the top of . . . Casey's left wrist . . . which [was] irritating and growing [slowly] but surely [and] [was] causing pain [such] that . . . Casey [could not] move his left wrist correctly." *Id.* On September 29, 2018, Casey had a follow up appointment with Dr. Mogerman. *Id.* During this appointment, Dr. Mogerman "observed" the lump. *Id.* Accordingly, Dr. Mogerman arranged for Casey "to be treated by a Physical Therapeutic Specialist." *Id.* Casey did so, and was "able to gain some of his strength in his left wrist back, but the lump in his wrist continue[d] to grow longer[.]" *Id.*

On October 22, 2018, a medical staff member, M. Kabonick ("Kabonick"), responded to Casey's sick-call request "regarding the constant pain in . . . Casey's left wrist, [which] had by then e[s]calated to a[n] 'excruciating pain.'" *Id.* at 3.

4

Kabonick "tr[i]ed to bend . . . Casey's wrist on various oc[c]asions[,] causing . . .

Casey even more pain, even though . . . Casey told him that such movements on

his left wrist [was] causing him even more pain[.]" *Id.*  Kabonick failed to measure

the lump with a medical ruler, check Casey's eyes with a loop, or refer Casey to a

physician's assistant or a doctor. *Id.*  Ultimately, Kabonick "order[ed] . . . Casey to

buy Aspirin from the commis[s]ary list for his pain" because "'there [was] nothing

else he [could] do.'" *Id.*

After this October 22, 2018 "incident," "other medical staff members . . .

denied [Casey] medical treatment[.]" *Id.*  As an example, Casey describes an

occasion in which he was in pain due to the infection in his wrist, and so he went to

the medical area "to be attended by medical staff[.]" *Id.*  On this date, Dental

Administrator L. Burns ("Burns") was in the medical area to write down the names

of inmates who request sick-calls and call them to be attended by medical staff. *Id.*

But Burns refused to place Casey on the medical list, and instead she ordered him

to return to his housing unit and told Casey that continued complaints about his

wrist will result in an incident report for stalking. *Id.*

In the amended complaint, Casey brings claims under the Federal Torts

Claims Act, 28 U.S.C. § 1346. *Doc. 46* at 1.  He alleges that he suffered permanent

nerve and tendon damage to his wrist and hand, and a reduction to 20 percent of

hand function. *Id.* at 5.  Accordingly, Casey seeks compensatory damages, punitive

damages, and reimbursement for the costs of litigation. *Id.*

### III.  Motion to Dismiss.

The United States moved for dismissal of the action pursuant to Fed. R. Civ.

P. 12(b)(1). *See docs. 53, 58.*  The FTCA gives district courts jurisdiction over

> civil actions on claims against the United States, for money
> damages . . . for . . . personal injury . . . caused by the negligent
> or wrongful act or omission of any employee of the
> Government while acting within the scope of his office or
> employment, under circumstances where the United States, if a
> private person, would be liable to the claimant in accordance
> with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).  The United States argues that the "independent-contractor

exemption" to the FTCA applies to this case and, accordingly, this court lacks

subject-matter jurisdiction. *Doc. 58* at 15.  The United States argues that "Dr.

Mogerman worked at USP Canaan as an independent contractor and as such, the

United States cannot be held liable for his actions." *Id.* at 16.

Casey addresses neither Dr. Mogerman's employment status nor the

independent-contractor exception in his brief in opposition. *Doc. 77.*  Casey does

argue, however, that the medical staff members at USP Canaan were responsible

for Casey's medical needs in addition to Dr. Mogerman. *Id.* at 12.  The United

States filed a reply brief that, relevantly, argued that Casey does not disagree that Dr. Mogerman is a contractor. *Doc. 80* at 3.

### A. Rule 12(b)(1) Standards.

Federal Rule of Civil Procedure 12(b)(1) permits the dismissal of an action for lack of subject-matter jurisdiction.  Challenges to subject-matter jurisdiction under Rule 12(b)(1) may be "facial" or "factual." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 811 (3d Cir. 2016).

A facial challenge to the court's subject-matter jurisdiction contests the sufficiency of the pleadings. *Id.*  When there is a facial challenge, "we apply the same standard as on review of a motion to dismiss under Rule 12(b)(6)." *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 633 (3d Cir. 2017).  Thus, with a facial challenge, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).  And "the court must consider the allegations of the complaint as true." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

A factual challenge to the court's subject-matter jurisdiction, as the United States brings here, "attacks the factual allegations underlying the complaint's assertion of jurisdiction, either through the filing of an answer or 'otherwise present[ing] competing facts.'" *Davis v. Wells Fargo*, 824 F.3d 333, 346 (3d Cir. 2016) (quoting *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014)).  In a factual attack the court does not presume that the plaintiff's allegations are true. *Id.*  Rather, "[i]n contrast to a facial challenge, a factual challenge allows 'a court [to] weigh and consider evidence outside the pleadings.'" *Id.* (quoting *Constitution Party*, 757 F.3d at 358)).

## B. Discussion.

The FTCA "was designed primarily to remove the sovereign immunity of the United States from suits in tort and, with certain specific exceptions, to render the Government liable in tort as a private individual would be under like circumstances." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 700 (2004) (quoting *Richards v. United States*, 369 U.S. 1, 6 (1962)).  A FTCA claim "is actionable if it alleges the six elements of § 1346(b), which are that the claim be: '[1] against the United States, [2] for money damages, . . . [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or

employment, [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.'" *Brownback v. King*, 141 S.Ct. 740, 746 (2021) (alterations in original) (citing *FDIC v. Meyer*, 510 U.S. 471, 475–76 (1994) (citing 28 U.S.C. § 1346(b)). "And in the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional." *Id.* at 749 (citing *Meyer*, 510 U.S. at 477).

An FTCA claim must allege actions or omissions on the part of an employee of the Government, which "include[s] officers and employees of any federal agency, but not 'any contractor with the United States.'" *E.D. v. United States*, 764 Fed. Appx. 169, 172 (3d Cir. 2019) (quoting *Norman v. United States*, 111 F.3d 356, 357 (3d Cir. 1997)). "A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Id.* (citing *United States v. Orleans*, 425 U.S. 807, 814 (1976) (quoting *Logue v. United States*, 412 U.S. 521, 528 (1973)). "In other words, 'the question here is . . . whether [the] day-to-day operations are supervised by the Federal Government.'" *Id.* (citing *Orleans*, 425 U.S. at 815).

The defendants filed a declaration signed by the USP Canaan Supervisory Contract Specialist, Kathleen Churchill. *Doc. 58-1*. The declaration states that "[f]rom October 3, 2014[,] to October 2, 2018, comprehensive medical services

were provided to inmates at USP Canaan pursuant to Contract No.

DJBP021500000026 with Integrated Medical Solutions (IMS)." *Id.*  After the

contract was extended to April 2, 2019, USP Canaan has continued its relationship

with IMS through "monthly purchase orders." *Id.*  And, since October 3, 2018, Dr.

Mogerman "provided services to inmates housed at USP Canaan pursuant to this

contract with IMS" such that his "services were invoiced by IMS and paid to

IMS." *Id.*  Accordingly, Dr. Mogerman is an employee of IMS, "an independent

contractor of the federal Bureau of Prisons[,]" rather than an employee of the

United States. *See Clemmons v. United States*, 793 Fed.Appx. 109, 114 n.7 (3d Cir.

2019).  The United States, therefore, cannot be held liable under the FTCA for Dr.

Mogerman's actions. *See id.* (affirming the District Court's dismissal of FTCA

claims against IMS, and one of its employees, because IMS is an independent

contractor).

The United States can, however, be held liable for the actions of its

employees pursuant to 28 U.S.C. §§ 1346 and 2671. *See Greenland v. United*

*States*, 661 Fed. Appx. 210, 214 (3d Cir. 2016) (overturning the district court's

dismissal of the complaint because "[i]n ruling on the motion to dismiss, the

District Court appears to have overlooked the allegations in the complaint that" the

plaintiff alleged that certain Bureau of Prison employees also were negligent in his

treatment).  Though Casey alleges that Dr. Mogerman performed surgery on his

wrist and, after seeing the lump on his wrist, referred him to a Physical Therapeutic Specialist, Casey also alleges that prison employees, Kabonick and Burns, failed to provide him proper medical services. *See doc.* 46-1.  Casey's allegations, therefore, are not based only on Dr. Mogerman's medical attentions but Kabonick's and Burns's medical treatments and lack thereof.  Accordingly, we will grant the United States' motion to dismiss the amended complaint insofar as we will dismiss for lack of jurisdiction any claims against the United States based on Dr. Mogerman's actions or omissions.

## IV.  Summary Judgment.

The United States also moved for summary judgment under Fed. R. Civ. P. 56(a). *Doc. 53.*  As described above, Casey brings claims against the United States under the FTCA, which finds a claim actionable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See Brownback v. King*, No. 19-546, 2021 WL 726222, at *2 (U.S. Feb. 25, 2021).  The United States argues that Casey cannot satisfy this element because he received "reasonable and appropriate medical care" and he lacks expert testimony to satisfy his burden of proof as required by Pennsylvania law.  *Doc. 58* at 24, 26.

Casey argues in his brief in opposition that he has been unable to retain an expert due to his *in forma pauperis* status. *Doc. 77* at 11.  Casey also argues that "[t]here were more th[a]n enough 'Red Flags', [*sic.*] to perform the extraction of such infection before it got to the point of burning any of [his] tendons[.]" *Id.* at 26. And Casey ultimately argues that the court should grant *him* summary judgment, because "while there are many disputed facts[,]" the five material facts[2] that are undisputed are all that "are necessary to prevail on his claim[.]" *Id.* at 19.  Though Casey further states that he "will demonstrate that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of this response, fell outside acceptable standards[,]" he instead argues that Dr. Mogerman, Kabonick, and Burns violated his Eighth Amendment rights,[3] a standard that is inapplicable in this FTCA action.

---

[2] Casey summarizes the five material facts as: "(1) Casey suffered from prolonged, intense pain; (2) Casey's constant complaints, proclaiming that he has an infection and needs to get a second surgery to treat the pain[;] (3) Medical staff members at [USP] Canaan along with [Dr.] Mogerman were aware that Casey was in excruciating pain with a cyst about 2.5cm in diameter raised approximately 5-6mm on his left hand/wrist[;] (4) Medical staff members at [USP] Canaan along with [Dr.] Mogerman delayed Casey's surgery for 268 days with cyst, in his left hand/wrist[;] (5) by delaying surgery, Casey has suffered permanent nerve and tendon damage to his left wrist/hand, suffering intense, unnecessary pain." *Doc. 77* at 19.  This passage not only includes legal conclusions but, as demonstrated below, these are not the only material facts upon which the parties agree.

[3] To the extent that Casey is attempting to amend his complaint to include Eighth Amendment claims through the submission of his brief in opposition, such attempts shall be disregarded.  It is axiomatic that a complaint cannot be amended

*Id.* at 9–10, 20–32.  In its reply brief, the United States again argues that the medical staff provided Casey with "reasonable and appropriate medical treatment" and, "[a]s such, it did not breach any duty to Casey." *Id.* at 79–80.  And, according to the United States, "Casey cannot meet his burden of showing that the BOP's care fell below the appropriate standard or caused his alleged injuries." *Id.* at 80.

### A.  Standards.

Rule 56(a) of the Federal Rules of Civil Procedure provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Through summary adjudication the court may dispose of those claims that do not present a 'genuine dispute as to any material fact' and for which a jury trial would be an empty and unnecessary formality." *Goudy-Bachman v. U.S. Dept. of Health & Human Services*, 811 F. Supp. 2d 1086, 1091 (M.D. Pa. 2011) (quoting Fed. R. Civ. P. 56(a)).

The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp. v.*

through a brief. *See Pennsylvania ex rel. Zimmerman v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir. 1988).

*Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. *Celotex*, 477 U.S. at 322.

Summary judgment is also appropriate if the nonmoving party provides merely colorable, conclusory, or speculative evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. *Id.* at 252.  "Where the record taken as a whole could not lead a

rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  A dispute about a material fact is genuine only if there is sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. *Id.* at 248–49.

When "faced with a summary judgment motion, the court must view the facts 'in the light most favorable to the nonmoving party.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter; rather it is to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249.  The proper inquiry of the court "is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.  "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex*, 477 U.S. at 323).  "[S]ummary judgment is essentially 'put up or shut up' time for the non-moving party: the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Group, Ltd. V. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006).

### B.  Material Facts.

Local Rule 56.1 requires a party moving for summary judgment to file "a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried." M.D. Pa. L.R. 56.1.  The Rule, in turn, requires the non-moving party to file "a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required [by the moving party], as

16

to which it is contended that there exists a genuine issue to be tried." *Id.*  The "[s]tatements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements," and "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." *Id*.

Here, the United States filed a statement of material facts in accordance with Local Rule 56.1. *Doc. 57*.  Casey filed a statement responding to the facts set forth by the United States, though he does not address each fact individually. *Doc. 78*. Instead, acknowledging that the United States' fact statements will be "deemed admitted," Casey addresses only "cert[a]in facts alleged by [the] defendant[ ]" that he believes were insufficient, and states "material facts the defendant[ ] left out[.]" *Id.* at 1–2.  These additional material facts are largely quotes from Casey's medical records. *Id.*  The United States makes it clear that it "will not dispute the information stated in his medical records." *Doc. 80*.  With these facts thus undisputed, we cite to the defendants' statement of material facts (*doc. 57*) and Casey's response thereto (*doc. 78*).

The following facts are the material facts for purposes of the pending summary judgment motion.  On June 17, 2018, Casey was playing basketball when he fell and injured his left wrist and hand. *Doc. 57* ¶ 1.  The next day, Casey

"presented to the health services unit" for his wrist and hand pain. *Id.* The health services staff noted that Casey's wrist and forearm were moderately swollen, and Casey had "decreased range of motion[,]" "increased pain upon movement[,]" and "tenderness to palpation[.]" *Id.* ¶ 2–3. Casey did not have ecchymosis, however, and his "distal pulses and sensation were intact." *Id.* ¶ 3–4. Casey was given an x-ray, which "showed an acute intraarticular distal radial fracture[,]" so the medical staff contacted Dr. Mogerman to evaluate and treat Casey further. *Id.* ¶ 6–7. In the meantime, the medical staff splinted Casey's wrist and prescribed him ibuprofen. *Id.* ¶ 5–6.

Dr. Mogerman reviewed the x-rays and "advised that he would see Casey during his next clinic at the institution," but he was recommending splinting or casting for six-weeks. *Id.* ¶ 8–9. Casey requested "ibuprofen for pain" and the medical staff thus increased the prescription to last 30 days. *Id.* ¶ 9–10. The medical staff further instructed Casey to "return to health services if he needed a new ACE wrap or extra padding for the splint." *Id.* ¶ 10–11.

On July 11, 2018, Casey was experiencing pain with only "minimal relief" from the current ibuprofen dosage. *Id.* ¶ 12–13. Because USP Canaan was in an institutional lockdown at the time, medical staff saw Casey at his cell door, after which the staff member "noted that Casey was wearing his splint at all times" and increased his ibuprofen order. *Id.* ¶ 12, 14–15.

Casey's evaluation with Dr. Mogerman occurred on July 21, 2018. *Id.* ¶ 16. Despite the previous splinting, "Casey was complaining of ongoing left wrist pain" and "Dr. Mogerman noted Casey had acute 'point' tenderness at the radial styloid process left wrist with mild edema." *Id.* ¶ 17–18. "Follow-up films" showed "mild, but distinct increased fracture displacement" and a "neurocirculatory exam . . . revealed Casey's left upper extremity and skin condition were satisfactory." *Id.* ¶ 17, 19. Accordingly, Dr. Mogerman reviewed treatment options with Casey, and Casey eventually gave his informed consent for a surgery "to attempt to restore anatomic fracture position and restore satisfactory comfort and function of the wrist." *Id.* ¶ 20–21.

Accordingly, "[o]n August 3, 2018, Dr. Mogerman performed" the surgery, "an open reduction and internal fixation of Casey's articular fracture of the left wrist[,] and applied a short arm volar fiberglass splint." *Id.* ¶ 22. One day after the surgery, Casey returned to USP Canaan where he "reported that his pain was 5/10 and his wrist was tender[,]" and "was instructed to report to medical daily for dressing and splint checks and was prescribed Percocet for pain . . . and . . . cephalexin[,]" an antibiotic. *Id.* ¶ 23–24.

Casey was examined again on August 7, 2018. *Id.* ¶ 26. The medical staff found that his "distal pulses and sensation were intact[,]" "[t]here was no erythema or swelling[,] and his capillary refill was less than two seconds[,]" and provided

Casey with "a copy of finger exercises[,] . . . an ACE wrap to keep the splint clean and dry[,]" and a prescription for Tylenol. *Id.* 25–28.  And on August 13, 2018, Casey reported "that he was doing his finger exercises" and was "feeling well[,]" though his pain remained at a 5/10 and "the Tylenol was not helping much with his pain." *Id.* ¶ 29, 30.  The medical staff noted that "Casey had full range of motion in all fingers, sensation and pulses were intact, and capillary refill was less than two seconds" and instructed Casey to "continue his finger exercises, keep the splint in place, and take Tylenol for pain." *Id.* ¶ 31–32.

On August 25, 2018, Casey reported to Dr. Mogerman that "he was very pleased and encouraged with improving comfort and function." *Id.* ¶ 33–34.  Dr. Mogerman removed Casey's splint and staples, noting that the incision was well healed, and applied steri-strips and a light dressing. *Id.* ¶ 35–36.  Dr. Mogerman examined Casey, noting that movement of the wrist was "overall very well tolerated[,]" that the "x-rays demonstrated maintenance of a very satisfactory osteosynthesis[,]" and that a "mild left wrist edema" was present. *Doc. 78* at 2–4; *see also doc. 57* ¶ 37–38.  Following this examination, Dr. Mogerman concluded that "[n]o further immobilization was needed" and recommended that Casey begin using his hand for light activities and certain exercises. *Doc. 78* at 2–4; *Doc. 57* ¶ 39–40.  Dr. Mogerman also prescribed physical therapy three times a week for four weeks and Meloxicam. *Doc. 78* at 2–3; *Doc. 57* ¶ 41.  Accordingly, Casey began

physical therapy on September 18, 2018, when his physical therapist noted the small lump on Casey's left wrist. *Doc. 78* at 5–7.

On September 22, 2018, Casey reported to Dr. Mogerman "dramatic improvement in comfort and function," despite "occasional episodes of discomfort" that, according to Casey, "would resolve after application of an elastic wrap." *Doc. 57* ¶ 42–43.  Dr. Mogerman observed that Casey had almost full range of motion, "full radial and ulnar deviation[,]" grip strength of 4+/5, and "full pronation and supination[,]" despite a "vague tenderness about the wrist with palpable extensor tenosynovitis evident[.]" *Id.* ¶ 45–47.  Dr. Mogerman thus permitted Casey to "continue his hair cutting duties," "recommended . . . continue[d] physical therapy[,]" instructed Casey to continue exercising and applying moist heat and topical liniment, and increased Casey's Meloxicam dosage. *Id.* ¶ 49–52.  On September 26, 2018, USP Canaan staff reviewed Dr. Mogerman's notes, but did not increase Casey's dose of Meloxicam "due to a low platelet count." *Id.* ¶ 53–54.

On September 27, 2018, Casey again attended physical therapy and "once again informed [the] physical therapist of an increas[e] in pain and increase in size" of the lump on his left hand. *Doc. 78* at 7–8; *Doc. 57* ¶ 55.  The physical therapist observed the lump, which "appeared cystic[,]" and provided Casey with an ACE wrap for compression, noting that if the lump did not improve, Casey may

need a "sooner follow-up with [Dr. Mogerman] for evaluation." *Doc. 78* at 7–8;
*Doc. 57* ¶ 56–57.  When Casey attended physical therapy on October 9, 2018, he
again asked the physical therapist to look at his wrist. *Doc. 78* at 8; *Doc. 57* ¶ 58–
59.  "The physical therapist noted that the cyst on Casey's left wrist had become
larger and more painful" and that Casey would be "further evaluated by Dr.
Mogerman at his next visit." *Doc. 78* at 8; *Doc. 57* ¶ 58–59.  Casey's Meloxicam
dose was increased to twice daily on October 11, 2018. *Doc. 57* ¶ 60.

Casey returned to sick call on October 22, 2018, with a pain level of 9/10
from the lump on his wrist and hand, which was now a 5-centimeter oval. *Id.* ¶ 61–
63.  The medical staff advised Casey to "continue using Meloxicam for pain" and
that "he would be scheduled to be seen by a provider[,]" but, instead, "[i]t was
noted that Casey was scheduled to be seen by Dr. Mogerman . . . in less than two
weeks and follow-up would occur at that point." *Id.* ¶ 64–66.

Casey's follow-up with Dr. Mogerman took place on November 3, 2018. *Id.*
¶ 67; *Doc. 78* at 9–12.  Casey "remain[ed] relatively comfortable" but was
concerned about increased "swelling and some tenderness at the dorsal aspect of
his left wrist region." *Doc. 78* at 9. Further, Casey had a "dull ache" at the
"extremes of motion" and "some residual deficit of motion[,]" and "was unable to
tolerate doing a pushup with his left wrist." *Doc. 57* ¶ 67–71.  Dr. Mogerman
examined Casey and observed that there was "evidence of extensive

22

tenosynovitis[,]" no acute inflammation, a "very functional range of motion[,]" and a left hand grip strength grade 5/5. *Doc. 57* ¶ 71–74.  Dr. Mogerman recommended Meloxicam, a liniment, moist heat, gradually progressing rehab exercises, and continued activities "as tolerated[.]" *Id.* ¶ 75–76.  Dr. Mogerman concluded that "the extensor tenosynovitis would likely improve with further conservative treatment but might ultimately require extensor tenosynovectomy surgery." *Id.* ¶ 77.

Just three days later, on November 6, 2018, Casey had another "clinical encounter . . . at [USP] Canaan Medical Area" where the staff "reviewed [the] recent orthopedic surgery post-op consultation," noted that there was "no further follow-up" due to satisfactory healing but Meloxicam would continue until January for pain. *Doc. 78* at 13.  Casey next attended the "chronic care clinic on November 26, 2018," where he reported a pain level of 6/10 and the staff submitted a consultation request "for Casey to be seen by Dr. Mogerman again." *Doc. 57* ¶ 78–80.  The report from this clinic stated, in part, that Casey had "seen Dr. Mogerman who [was] recommending further surgery due to tenosynovitis" and that Casey was depressed. *Doc. 78* at 14–18.  Just two days later, on November 28, 2018, Casey returned to sick call, reporting that the lump on his hand, which had been present since his surgery, was causing "constant and sharp" pain at a 9/10 level. *Doc. 57* ¶ 81–83.  The sick call staff member, noting that Casey's hand had a

23

five-centimeter oval-shaped lump, informed Casey that he would be scheduled to see a provider and, in the meantime, advised Casey to continue using Meloxicam for pain management. *Doc. 78* at 19–22; *see also doc. 57* ¶ 81–85.

On December 20, 2018, Casey was scheduled for an appointment to evaluate his "infection," but, when he failed to attend the appointment, it was canceled. *Doc. 57* ¶ 86–87; *Doc. 78* at 23. Casey did, however, present to sick call the next day, December 21, 2018, again reporting pain and an infection in the lump in his hand. *Doc. 57* ¶ 88. It was on this date that Burns issued Casey a stalking warning based on the fact that she felt he "was coming to sick call very often[,]" considering Dr. Mogerman's diagnosis that the lump would likely heal naturally. *Doc. 57* ¶ 95. The parties dispute whether Casey was, in fact, seen by a medical staff member on this date. *Compare doc. 57* ¶ 94 – 98 *with doc. 78* at 24–29, 30–32.

The parties do not dispute, however, that on December 22, 2018, Casey had an appointment with Dr. Mogerman. *Doc. 57* ¶ 99 – 101; *Doc. 78* at 33–35. Dr. Mogerman examined Casey, finding that "the surgical incision was well-healed with slight tenderness in the region," and "more moderate tenderness across the dorsum of the left wrist and hand." *Doc. 57* ¶ 99–100. Dr. Mogerman further found that Casey's "extensor tenosynovitis had failed to respond to conservative treatment with moist heat and anti-inflammatory medication." *Doc. 57* ¶ 100. Dr.

24

Mogerman recommended that Casey undergo surgery for extensor tenosynovectomy and hardware removal and, when Casey consented, Dr. Mogerman instructed that the procedure would "be scheduled promptly as the elective surgical list allows." *Doc. 78* at 35; *see also doc. 57* ¶ 101.  Accordingly, on December 26, 2018, "[a] consultation request was submitted for surgery[.]" *Doc. 57* ¶ 102.

Casey was scheduled for surgery to take place on April 26, 2019. *Doc. 57* ¶ 103.  Dr. Mogerman began with a preoperative examination when he noticed for the first time that "there was approximately one centimeter of extension lag at the middle finger[.]" *Id.* ¶ 104; *see also doc. 78* at 38–39.  Dr. Mogerman noted a "substantial area of extensor tenosynovitis[,]" which he excised in the surgery, and also discovered that tendons in the index and middle finger had ruptured, which he repaired by tendon transfer. *Doc. 57* ¶ 105–07.  Dr. Mogerman did not, however, remove the bone screw because it "did not appear to have any causal relationship to the extensor tenosynovitis[.]" *Id.* ¶ 108.  Finally, Dr. Mogerman applied a "volar extension split." *Id.* ¶ 109.  Casey was then returned to USP Canaan and prescribed Percocet, Tylenol, and Meloxicam. *Id.* at 109–10.  On April 29, 2019, a Nava Nawaz filed a "surgical pathology report" memorializing Casey's final diagnoses. *Doc. 78* at 45–46.

When Casey's bandages were removed on May 2, 2019, the medical staff cleansed the swollen area and healing scar with saline and applied a new dressing and split. *Doc. 57* ¶ 111–14.  Casey reported throbbing pain at a 5/10 level and was provided with a sling and instructions to monitor for infection and follow-up as scheduled. *Id.* ¶ 115–18.  On May 10, 2019, Casey returned to sick call with pain in his wrist. *Id.* ¶ 119.  Though he was instructed to return the next day, after the staff had an opportunity to contact Dr. Mogerman, Casey did not return. *Id.* ¶ 120–21.  Casey also did not attend the appointment made for him on May 13, 2019. *Id.* ¶ 122–23.  On May 17, 2019, Casey returned to health services with a well-healed incision, minimal swelling, a decreased range of motion, and reports of depression but no pain. *Id.* ¶ 124–27; *see also doc. 78* at 47–51.  The medical staff removed the staples "easily[,]" painted the incision with betadine and covered it with bacitracin, gauze, and an ACE wrap, gave Casey "gentle range of motion exercises to perform every hour while awake[,]" and informed Casey that a "physical therapy consultation was also requested." *Id.* ¶ 128–30.  But on May 23, 2019, the staff informed Casey that "there was no physical therapist on site at the institution at that time[,]" and instead gave Casey "two handouts of wrist and hand exercises with follow-up planned for approximately one month later[.]" *Id.* ¶ 131.  And on June 3, 2019, Casey received a stress ball. *Id.* ¶ 132.

Casey received an x-ray on June 13, 2019, which showed that "a stable, intact orthopedic screw through the radial styloid with complete healing of the underlying fracture." *Id.* ¶ 133.  When he saw Dr. Mogerman on June 15, 2019, Casey "reported gradual improvement in comfort and function in his left hand and wrist[,]" and that he was "pleased and encouraged by his progress" with physical therapy. *Id.* ¶ 134–36.  Dr. Mogerman observed on the x-ray "mature healing of the fracture[,]" and examined Casey, finding that Casey was regaining range of motion. *Id.* ¶ 137–38.  Dr. Mogerman instructed Casey to "continue rehab exercises." *Id.* ¶ 139.

When Casey "requested a refill of Meloxicam in July 2019," the medical staff denied the refill and ordered acetaminophen instead. *Id.* ¶ 140–41.  November 18, 2020, Casey returned to health services and, upon reporting that he was experiencing an aching pain at a level of 4/10, was examined and exhibited a "decreased range of motion to flexion and extension[.]" *Id.* ¶ 142–44. Accordingly, the staff instructed Casey "to use moist heat therapy and begin range of motion exercises." *Id.* ¶ 145.

On May 4, 2021, Casey received a medical visit at the door of his cell and reported experiencing hand swelling, as well as loss of range of motion and trouble closing his hand, which the medical staff also observed. *Id.* ¶ 146–49; *see also doc. 78* at 52–56.  "A consultation request was submitted for follow-up with a

specialist." *Doc. 57* ¶ 149.  Before this consultation could occur, on May 27, 2021,

Casey requested and was prescribed seven days of acetaminophen. *Id.* ¶ 150–51.

Casey was then transferred to USP Thomson on June 14, 2021, and on July 28,

2021, the consultation request was renewed "at his initial physician evaluation." *Id.*

¶ 152.

Casey experienced continued pain through July 5, 2022, and received

treatments including an MRI and pain medications for that same time period. *See

doc. 78* at 60–68.

### C.  Discussion.

In an FTCA action, as Casey brings here, the Court applies the law of the

state where the alleged tortious conduct occurred. 28 U.S.C. § 1346(b).  In this

case, because Casey is complaining about acts and omissions that occurred in

Pennsylvania, we apply the law of Pennsylvania.

Pennsylvania Rule of Civil Procedure 1042.3(a) requires a certificate of

merit in professional liability cases:

> (a) In any action based upon an allegation that a licensed
> professional deviated from an acceptable professional standard,
> the attorney for the plaintiff, or the plaintiff if not represented,
> shall file with the complaint or within sixty days after the filing
> of the complaint, a certificate of merit signed by the attorney or
> party [certifying] that either
> (1) an appropriate licensed professional has supplied a written
> statement that there exists a reasonable probability that the care,

> skill or knowledge exercised or exhibited in the treatment,
> practice or work that is the subject of the complaint, fell outside
> acceptable professional standards and that such conduct was a
> cause in bringing about the harm, or
> (2) the claim that the defendant deviated from an acceptable
> professional standard is based solely on allegations that other
> licensed professionals for whom this defendant is responsible
> deviated from an acceptable professional standard, or
> (3) expert testimony of an appropriate licensed professional is
> unnecessary for prosecution of the claim.

Rule 1042.3(e) further provides that "[i]f a certificate of merit is not signed by an attorney, the party signing the certificate of merit, shall, in addition to the other requirements of this rule, attach to the certificate of merit the written statement from an appropriate licensed professional as required by subdivisions (a)(1) and (2)." The form a certificate of merit should take is set forth in Pa. R. Civ. P. 1042.10, which provides that the certificate "shall be substantially on the following form" and then sets forth the three alternatives under Pa. R. Civ. P. 10423(a) with a box for a checkmark before each alternative.

The certificate-of-merit requirement applies to civil actions in which a professional liability claim is asserted against a licensed professional,[4] Pa. R. Civ. P. 1042.1(a), and it is a substantive law that applies in federal court to claims

---

[4] Insofar as Casey's FTCA claim against the United States is based on Burns's actions, and insofar as Burns, as a dental administrator, is not a licensed professional, Casey need not file a certificate of merit to proceed on this claim. In this case, as discussed below, an expert would still be required to establish even the claims premised on Burns's actions and inactions.

brought under the court's diversity jurisdiction. *Liggon-Redding v. Estates of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011).  It also applies to FTCA claims based on medical malpractice. *See Smith v. United States*, 498 F. App'x 120, 121 (3d Cir. 2012) (agreeing with the district court's decision to dismiss an FTCA claim of medical negligence because the plaintiff failed to file a certificate of merit); *Hodge v. U.S. Dep't of Justice*, 372 F. App'x 264, 267 (3d Cir. 2010) (same).

When a plaintiff fails to submit a required certificate of merit, dismissal without prejudice is warranted. *See Davis v. Pennsylvania Dep't of Corr.*, 3:12-CV-02161, 2013 WL 6837797, at *1 (M.D. Pa. Dec. 23, 2013).  "That ultimate consequence of the failure to comply—termination of the suit—is effectuated in state court upon the filing of a praecipe with a prothonotary, who in turn enters a judgment of non pros." *Schmigel v. Uchal*, 800 F.3d 113, 117 (3d Cir. 2015) (footnote omitted).  But before seeking non pros, a defendant generally must file a written notice of intention to file a praecipe of non pros and serve that notice on the plaintiff "no sooner than the thirty-first day after the filing of the complaint." Pa. R. Civ. P. 1042.6 (a).  Notice is not required, however, before a judgment of non pros is entered where "the court has granted a motion to extend the time to file the certificate and the plaintiff has failed to file it within the extended time." Pa. R. Civ. P. 1042.6(b).  Like the certificate-of-merit requirement, "[t]he condition of thirty days' notice prior to seeking dismissal of an action for failure to comply with

the [certificate of merit] regime is substantive and must be applied in federal court." *Schmigel*, 800 F.3d at 124.

There is no prothonotary in the federal system and dismissal is sought by filing an appropriate motion, not a praecipe. *See* Fed. R. Civ. P. 7(b) ("A request for a court order must be made by motion.").  The Third Circuit has "rejected the argument that the differences in the mechanism to accomplish [a] dismissal, i.e., a praecipe filed with a prothonotary in state court versus the filing of an appropriate motion in federal court," raises a conflict. *Schmigel*, 800 F.3d at 122.  It also maintains that the certificate-of-merit "requirement and its conditions are facts that can form the basis of a motion for summary judgment." *Id.*

Here, Casey has failed to file a certificate of merit despite multiple extensions of time to do so. *See docket generally*; *see also docs. 18, 25, 32, 48, 50*. Though he once attempted to file a certificate of merit (*doc. 35*), we struck this filing because it failed to comply with the requirement of Pa. R. Civ. P. 1042.3 (*doc. 48*).  And Casey has not attempted to file another certificate of merit, because of his "lack of economy." *Doc. 77* at 11.  To the extent that Casey argues he needs no expert—though his brief in opposition is entirely unclear on this point and instead relies on Eighth Amendment standards[5] inapplicable here—mere argument

---

[5] *See doc. 77* at 12 (arguing that his injury was a "serious medical need" because it was "so obvious that even a lay person would easily recognize the

does not satisfy the requirement that one must file a certificate of merit and,

further, as explained below, the United States would then be entitled to summary

judgment on this claim for want of a medical expert.

The Third Circuit has "recognized the need for expert testimony in proving a

claim based on medical injury." *Montgomery v. Pinchak*, 294 F.3d 492, 504 (3d

Cir. 2002) (citing *Parham v. Johnson*, 126 F.3d 454, 460 (3d Cir. 1997)).  "The

policy behind the Third Circuit's requirement for expert testimony is that claims

for medical malpractice are complex and require an understanding of facts and

medical records that "even most lawyers struggle to comprehend." *Rodriguez v.*

*United States*, Civil Action No. 3:14-1149, 2016 WL 1255290, at *4 (M.D. Pa.

Mar. 28, 2016) (citing *Parham*, 126 F.3d at 460).  "However, in limited

circumstances, an expert witness may not be required because 'the matter is so

simple or the lack of care so obvious as to be within the range of experience and

comprehension of non-professional persons." *Id.* (citing *Illes v. Beaven*, No. 1:12-

CV-0395, 2012 WL 2836581, at *3 (M.D. Pa. July 10, 2012) (internal citations and

quotations omitted)).  This is not one of those cases.  Casey received care

consistently for several months, beginning the day after his injury.  The propriety

of the more conservative treatment regime followed to address the lump on

---

necessity for a doctor's attention") (citing *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40
F.3d 1176, 1187 (11th Cir. 1994).

Casey's hand cannot be said to be "so simple . . . as to be within in the range of experience and comprehension of non-professional persons." *Id.* (citing *Illes*, 2012 WL 2836581, at *3) (internal citations and quotations omitted)).  And the only time it appears Casey "lacked" care was December 21, 2018, when he reported to sick call and was issued a stalking warning. *See doc. 57* ¶ 88–95; *doc. 78* at 24–29, 30–32.  But it is undisputed that any lack of care ended on December 22, 2018, when Casey had an appointment with Dr. Mogerman. *See doc. 57* ¶ 99–101; *doc. 78* at 33–35.  There is no evidence to suggest, much less make it obvious, that this one-day delay in care adversely affected Casey's medical treatment.

The facts are undisputed, and without an expert, Casey would be unable to prove medical malpractice.  And Casey is foreclosed from presenting expert testimony due to his failure to file a certificate of merit indicating that an "appropriate licensed professional" has found that the care fell outside acceptable professional standards, Casey is precluded from presenting expert testimony "on the questions of standard of care and causation." *Rodriguez*, 2016 WL 1255290, at *3 (citing Pa. R. Civ. P. 104.2(a)(3)).  We thus conclude that the United States is entitled to summary judgment.

**V.  Conclusion.**

Based on the foregoing, we will grant the United States' motion to dismiss the case against it insofar as the claims are based on the actions of Dr. Mogerman. We will also grant the United States' motion for summary judgment on the remaining claims.  An appropriate order follows.

<u>***S/Susan E. Schwab***</u>
Susan E. Schwab
United States Magistrate Judge